2021 IL App (1st) 191374-U

THIRD DIVISION
January 27, 2021

No. 1-19-1374

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 21181 |
| | ) | |
| DAVEED LAZARD, | ) | Honorable |
| | ) | William G. Gamboney, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE HOWSE delivered the judgment of the court.
Justices McBride and Burke concurred in the judgment.

ORDER

¶ 1    *Held*:   The judgment of the circuit court of Cook County summarily dismissing defendant's postconviction petition is affirmed; defendant failed to state an arguable claim his sentence violates the Proportionate Penalties Clause of the Illinois Constitution as applied to him where defendant did not receive a *de facto* life sentence; defendant did not receive ineffective assistance of counsel based on trial counsel's failure to call a witness who would have provided only cumulative testimony.

¶ 2    Defendant was convicted of attempt first degree murder, aggravated battery with a firearm, and aggravated discharge of a firearm for firing into a vehicle and striking Tamika Readus for which he was sentenced to 32 years' imprisonment.  Defendant was 17-years old at the time of the offense.  His conviction and sentence were subsequently affirmed by this court on direct appeal.  Thereafter, defendant filed a postconviction petition which was summarily

dismissed at first stage proceedings. In his postconviction petition, defendant's arguments included a claim his trial counsel was ineffective for failing to fully investigate and use witness Romalice Brooks to contradict the State's evidence and support defendant's claim of self-defense. This is the only issue from his postconviction petition raised by defendant on appeal. While not included in his postconviction petition, defendant also argues for the first time on appeal the 20-year firearm enhancement to his attempt murder sentence violated the Proportionate Penalties Clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) as applied to him. For the reasons set forth below we affirm.

¶ 3                                        BACKGROUND

¶ 4                                      Defendant's Trial

¶ 5      Below we recount the relevant evidence and details from defendant's trial as previously set forth by this court on direct appeal.

¶ 6      On June 16, 2013, defendant, his girlfriend, and other people were gathered outside their apartment building at a Father's Day barbeque. According to defendant, a car drove erratically and stopped right in front of defendant and crashed into another car. Defendant testified he pushed his girlfriend out of the way. Defendant then fired his gun multiple times at the car. The victim, Tamika Readus, was shot three times. The driver, Adam Hollingsworth who was Readus' husband, was shot once in the shoulder.

¶ 7      Two weeks after the shooting defendant approached Hollingsworth and Readus, and defendant told Readus he was sorry for shooting her. Readus then went to police with a name of the suspect. She later identified defendant from a photo array and a physical lineup as the person who told her he shot her. Defendant was arrested by police and given *Miranda* warnings. While he was being transported to the police station after his arrest, defendant told the transporting

officers that he was sorry for shooting Readus and told them he had apologized to her. The State charged defendant with attempt (first degree murder), aggravated battery with a firearm, and aggravated discharge of a firearm. Tamika Readus was the first witness to testify in the State's case in chief.

¶ 8                                    Testimony of Tamika Readus

¶ 9      In June 2013, Readus was married to Hollingsworth. On the afternoon of June 13, 2013, Hollingsworth and Readus were preparing to go to a Father's Day barbeque near Washington Park. They arrived at the barbeque around 9 p.m. They stayed for a short amount of time and then left with two of Hollingsworth's cousins. Hollingsworth was driving the car. They were traveling toward Stony Island when they stopped at a stop sign on Park Shore East and 62nd Street. Readus testified Hollingsworth was driving normally, the car was operating normally, the headlights were operating normally, and she could tell by looking out the windshield the headlights were on. A person was crossing the street in front of them and they stayed stopped at the stop sign for some two or three minutes. Hollingsworth then abruptly accelerated to 25 or 30 miles per hour and made a left turn. He then braked hard and came to a stop behind another car parallel to the curb. Readus then saw smoke and a group of people started running. When she heard a noise, Readus thought she heard a firework going off from the group of people nearby. She looked down and saw that she was shot. Readus yelled to Hollingsworth that she had been shot. Hollingsworth was trying to get out of the car and when he heard Readus yell she had been shot, he drove her to the University of Chicago Hospital. While undergoing treatment at that hospital, Readus blacked out. When she awoke, she was in Mount Sinai Hospital. She had gunshot wounds in her chest, side, and lower back. Readus recalled speaking to Detective Vidas

Nemickes while she was at the hospital, though she could not recall when. Readus was discharged from the hospital after one week.

¶ 10    After she had been discharged from the hospital, Readus and Hollingsworth went together to a barbeque near Jackson Park for the July 4th holiday. This was the same area where Readus had been shot. Hollingsworth sent someone to get defendant from a house, and defendant came out with a few other people. Defendant then began to apologize to Readus, telling her it was a mistake and "that they were at war with some people," though Readus could not recall his exact words. Readus began crying and defendant attempted to hug her. He then walked off and Hollingsworth told the group of people that defendant needed to be "violated." A member of the group then punched defendant in the face. Readus and Hollingsworth left the barbeque after.

¶ 11    When Readus returned to her parents' house, she called Detective Nemickes. She told him she knew who shot her: a person known as "Dallo" (Dallo was defendant's nickname). Readus required further medical treatment to remove another bullet from her back, which was removed at Mount Sinai Hospital in early July of 2013. She testified she still had the bullet stuck in her chest. After the surgery, Readus met with Detective Nemickes in July. She signed paperwork and was asked to look at a photographic array. She identified defendant's picture as a picture of the person who shot her.

¶ 12    Under cross-examination, Readus testified Hollingsworth was not driving responsibly on June 13, 2013. She also testified that prior to going to the barbeque at 9 p.m., they were "lay[ing] around the house," though neither of them were smoking or drinking. Readus testified Hollingsworth does not drink or smoke.

¶ 13                    Testimony of Detective Majdi Shalabi

¶ 14 Detective Shalabi received an assignment from Detective Nemickes to apprehend defendant on suspicion of shooting Readus. On July 17, 2013, Detective Shalabi and his partner, Officer Joseph Tracy, went to defendant's home and placed him in custody. Detective Shalabi testified he then read defendant his *Miranda* warnings. Defendant was then placed in the back seat of the detective's car. While Detective Shalabi and his partner were driving defendant to the police station, defendant began speaking to them. Detective Shalabi testified he did not initiate the conversation with defendant. Defendant told Detective Shalabi that he did not mean to shoot the lady and that he gave her a hug and said he was sorry. At that point Detective Shalabi again read defendant his *Miranda* warnings and told defendant to stay quiet until his mother or another parent or guardian was present. Detective Shalabi then called defendant's mother. Once they transported defendant to the area central detective division, they handed defendant over to Detective Nemickes. Detective Shalabi did not have further contact with this case until October 9, 2013, when he went to arrest defendant at Hyde Park High School.

¶ 15                                  Testimony of Detective Vidas Nemickes

¶ 16 Detective Nemickes testified he received an assignment on June 16, 2013 to report to the University of Chicago hospital because two people had been shot.

¶ 17 Detective Nemickes spoke with Readus on June 19, 2013. On July 3, 2013, Detective Nemickes spoke with Readus a second time because Readus called him and informed him she knew the identity of her shooter. Detective Nemickes then reached out to Hollingsworth, but Hollingsworth was not cooperative. On July 11, 2013, Detective Nemickes met with Readus at his office to show her a photographic array. She identified defendant in one of the photos and told the detective that was the person who apologized for shooting her. Detective Nemickes next met with Readus at the police station on the night of July 17, 2013, in order to view a physical

lineup. Readus viewed the lineup at around 1 a.m. on July 18, and immediately identified defendant as the person who apologized to her for shooting her.

¶ 18    Although Detective Nemickes was unable to locate the weapon used to shoot Readus, he was able to recover a fired bullet that was recovered from Readus's body. He did not recover any shell casings from the crime scene. After admitting exhibits into the record, the State rested.

¶ 19    Defendant's trial counsel made a motion for directed finding after the close of the State's case. The trial court denied this motion.

¶ 20                              Testimony of Adam Hollingsworth

¶ 21    Hollingsworth was the first witness to testify for the defense. Hollingsworth testified he was at his home with Readus, along with their uncle and his wife, on the afternoon of June 16, 2013. They were playing cards and drinking hard liquor. Hollingsworth testified he began drinking at 11 a.m. that day. Prior to leaving his house, Hollingsworth consumed two or three cups of liquor. At around 3 p.m. Hollingsworth and Readus drove to a barbeque in Washington Park. They were at the barbeque in the park for a couple of hours. Hollingsworth was with family and drinking more liquor. When it began to turn dark outside, Hollingsworth left with Readus and two of his cousins to go to another barbeque close to Hyde Park, near Stony Island and 61st.

¶ 22    Hollingsworth testified he was driving a green Suzuki, and was driving in a reckless manner. He stated he "was driving wild." Hollingsworth "was driving reckless, and I had hit the corner without hitting the brakes. Well, I thought I hit the brakes. But the next thing you know, I had -- I don't know. I had passed out. * * * I remember hitting the sidewalk." He was speeding, going about 45 miles per hour in a 25 mile per hour speed zone. He did not recall whether he had his headlights on that night. Hollingsworth had consumed some five or six cups

of hard liquor by that point. He remembered turning onto a street before hitting the sidewalk, but could not remember whether he stopped at the stop sign. He recalled hitting the gas and turning when he got to the stop sign. Hollingsworth passed out from intoxication after hitting the curb. The pain from being shot brought Hollingsworth to, and he realized he had stopped his car on the sidewalk next to a driveway. After he and Readus were shot, Hollingsworth drove them to the University of Chicago hospital. Hollingsworth had been shot in the shoulder and the bullet was not taken out. He released himself from the hospital after he was treated.

¶ 23 Two days after Hollingsworth left the hospital he received a Facebook message from defendant. A few days later, defendant met with Hollingsworth and gave him some money for the broken windshield in Hollingsworth's car. Defendant also apologized for shooting Hollingsworth and Readus. Hollingsworth testified defendant was a friend of his.

¶ 24 Shortly after the July 4th holiday, Hollingsworth met with Detective Nemickes at the police station. Detective Nemickes showed Hollingsworth a photo of defendant and Hollingsworth told the detective that this was not the person who shot him. On redirect examination, Hollingsworth was shown a photo of his car taken by police the night of the shooting while Hollingsworth was in the hospital. Hollingsworth identified a cup in the center front console as the cup he was drinking out of that night and said that there was alcohol in it.

¶ 25                        Testimony of Behname Pierce

¶ 26 Pierce testified he was at Park Shore East and 62nd, at the Park Shore East Apartments, on June 16, 2013. He was standing outside with a few of his friends at around 9:45 or 10 p.m. and saw defendant across the street. Defendant was with a group of people outside at a Father's Day picnic. Pierce then "saw a dark colored car speeding from around the corner from behind" Hyde Park High School. The car had its headlights off, failed to stop at the stop sign, sped

around the corner, hit the brake, and made a loud screeching noise.  Pierce thought the car was traveling over the speed limit, moving about 40 or 50 miles per hour.  The car ran into the back of a parked car defendant was standing next to.  Pierce testified that when the dark colored car ran into the back of a parked car, he and his friends "all ducked and ran inside Park Shore East Apartments."  Pierce heard "about two, three gunshots," though he did not see who did the shooting.  Pierce began to run before the gunshots "because normally when a car comes around the corner, headlights off, that fast, it normally – it's a drive-by.  That's the first thing that come to mind.  So my first intention was to run."  After the car drove off, Pierce returned outside.  His friends and other people were back outside, making sure nobody had been shot.

¶ 27                              Testimony of Raven Gilliam

¶ 28    Gilliam, 17-years old at the time of the trial, testified she had been in a relationship with defendant for the past three years.  They had a child together, who was one year old at the time.  On June 16, 2013, Gilliam was with defendant outside on 62nd and Park Shore East before 10 p.m.  They were standing close to the parking lot entrance to the apartment complex with one of Gilliam's friends.  About 30 people were around outside.

¶ 29    Gilliam saw a car coming down Park Shore East towards her.  The car did not have its headlights on, failed to stop at the stop sign, and was going about 35-40 miles per hour.  The stop sign was about 25 feet from where Gilliam, her friend, and defendant were standing.  The car drove onto the curb close to where they were standing.  When the car got to within inches of Gilliam, defendant pushed her out of the way.  She was face down in the grass when she heard gunshots, though she could not remember how many shots were fired.  After she heard the gunshots, everyone in the area ran in different directions.

¶ 30                              Defendant's Testimony

¶ 31    On June 16, 2013, at about 9:45 p.m., defendant was outside near 62nd and Park Shore East. He was standing with his girlfriend, Gilliam, and one of her friends. They were about 15 feet from the parking lot entrance. While they were talking, defendant heard someone say "watch out," and he turned to see a car coming towards them. The car failed to stop at a stop sign, turned left off of Park Shore East, had no headlights on, and drove recklessly - traveling about 40-50 miles per hour. Defendant saw the car when it was about 28 feet away. Seconds later, the car was driving onto the curb within 5 feet of defendant. He pulled out his gun and pushed Gilliam out of the way. Once he pushed Gilliam out of the way, defendant started shooting at the car. He believed someone in the car was about to do a drive-by shooting or hit them with the car. After he finished firing his weapon, defendant ran away.

¶ 32    On cross-examination, defendant testified he could have run from the car when it was approaching him. He fired at the car when it was about 20 feet from him and coming towards him. When the car came onto the curb he started running away from the car and shooting at it. Defendant also testified he did not think the car was in danger of hitting him. He did not see anyone with a weapon in the vehicle and nobody in the car lowered their windows. That same night, defendant threw his gun in Lake Michigan. The gun was not recovered.

¶ 33    Defendant had known Hollingsworth prior to the shooting. Two days after the shooting, defendant contacted Hollingsworth. He met with Hollingsworth and a woman who was with Hollingsworth in late June. Defendant then rested his case-in-chief.

¶ 34                        Rebuttal Testimony of Officer Ford

¶ 35    Officer Ford testified that when he responded to the shooting at 62nd and Park Shore East, he did not observe the grass near the curb to be disturbed as if some car had driven on it. When Officer Ford was at the University of Chicago hospital and had an opportunity to see the

car Hollingsworth had been driving the night of the shooting, he did not see any damage to the front side of the car. Officer Ford also testified he did not smell alcohol coming from Hollingsworth when he asked Hollingsworth questions at the hospital. Hollingsworth was not acting inebriated, though he did appear to be injured.

¶ 36                                Rebuttal Testimony of Detective Nemickes

¶ 37    Detective Nemickes also did not observe any damage, other than the gunshots to the window and hood, to the vehicle Hollingsworth was driving. Detective Nemickes went to the scene of the crime after leaving the hospital. He did not observe any signs of grass being disturbed and did not see any skid marks or turned-up grass. Detective Nemickes did not observe any evidence of a crash.

¶ 38    After the State rested its case, defense counsel requested the jury be instructed as to self-defense. The trial court found there was "sufficient evidence to instruct the jury as to that offense. So over the State's objection, the jury will be instructed." Defense counsel argued in closing argument that defendant acted in self-defense. Counsel argued that when a "car is driving like that in that neighborhood, you're afraid of a possible drive-by shooting." The State objected and the trial court overruled the State's objection.

¶ 39    The jury found defendant guilty of attempt (first degree murder), aggravated battery with a firearm, and aggravated discharge of a firearm. *People v. Lazard*, 2018 IL App (1st) 160047-U, ¶¶ 4-40.

¶ 40                                Defendant's Sentencing Hearing

¶ 41    With respect to defendant's sentencing, our prior decision set forth the following facts:

            "The court ordered a presentence investigation report. At the sentencing

            hearing the state argued defendant's prior gang involvement was an aggravating

factor. Defense counsel argued for mitigating factors, stating defendant had not been arrested before and pointing to defendant's academic achievements while in custody. Counsel requested the minimum sentence. The court sentenced defendant to 12 years' imprisonment for attempt (first degree murder) with an additional 20-year enhancement for personally discharging a firearm. The court merged defendant's convictions for aggravated battery with a firearm with his conviction for attempt (first degree murder). For aggravated discharge of a firearm, the court sentenced defendant to 12 years' imprisonment, to run concurrently with his sentence for attempt (first degree murder). Defense counsel made an oral motion to reconsider the sentence because of defendant's lack of criminal history, requesting the minimum sentence. The court denied the motion to reconsider and granted defendant's leave to file notice of appeal." *Id*. at ¶ 40.

¶ 42                                   Direct Appeal

¶ 43     On direct appeal, defendant argued "his conviction for attempt (first degree murder) should be vacated because [(1)] the evidence at trial showed he had an unreasonable belief in the need to use deadly force in self-defense" and (2) "he was deprived of his constitutional right to the effective assistance of counsel because his trial counsel did not request the jury be instructed to acquit if it found defendant had an unreasonable belief in the need to use deadly force in self-defense." See *id*. at ¶ 42. Defendant further argued in his opening brief "he was entitled to a new sentencing hearing based on the retroactive application of the statutory change from mandatory [to discretionary] firearm sentencing enhancements for juveniles under 730 ILCS 5/5-4.5-105(b) (West 2016). See *id*. at ¶ 43. However, defendant, in his reply brief, conceded *People v. Hunter*, 2017 IL 121306, resolved the issue finding "the change from mandatory to

discretionary firearm sentencing enhancements for juveniles did not apply retroactively" such that "his argument for retroactive application of the sentencing statute was no longer viable." See *Lazard*, 2018 IL App (1st) 160047-U, ¶ 43.

¶ 44                              Postconviction Petition

¶ 45    On April 1, 2019, defendant filed a *pro se* postconviction petition pursuant to section 5/122-1 of the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 (West 2018)).

¶ 46    In addition to contending he was denied a fair trial due to prosecutorial misconduct, defendant's postconviction petition argued his counsel was ineffective for (1) "failing to seek expert witness testimony at trial and on direct appeal and (2) failing to fully investigate and use witness Romalice Brooks, who was in the victim['] s car at the time of the in[]cident, and who was willing to testify at trial, which would have contradicted the State's case and would have raised reasonable doubt." In addition to his own affidavit, defendant attached Brooks's affidavit which stated:

> "Pursuant to 28 U.S.C 17461 I Romalice Brooks declare under penalty of perjury that the following information is true and correct. During the time of the incident I was located in the back seat of a green Suzuki, 2001. On June 16, 2013, I was willing to testify at trial on behalf of Mr. Lazard. I made myself available for his attorney but was told I will not be needed. Recently I found out that Mr. Lazard was sentenced to 32 years. I honestly believe had I been called; my testimony would've made a difference in the outcome of Mr. Lazard's [trial]. My testimony would have been, I was sitting in the back seat and the only person sober out of Adam Hollingsworth, Rickey Rozelle, and Tomika Readus, who were all drinking. I constantly reminded Adam to turn on his headlights and

telling him to stop driving so fast. Once we got to 62nd Street, Adam said "There go Dallo, I'm about to scare his a[**]. Adam sped up and made a left turn. I shouted at him to slow down, while tapping on his shoulder. Adam was not responding as he drove towards a crowd of people who were on the sidewalk where he jumped the curb. I saw a female inches away from the front of the car. If Mr. Lazard had not start[ed] shooting Adam would have hit the crowd of people. Honestly, Mr. Lazard saved not only his life but everyone who was standing on the curb. Once we came to a stop, Adam got out the car and said, "It's me, Adam, I was just playing."

¶ 47 The trial court subsequently entered a judgment summarily dismissing defendant's postconviction petition finding defendant's claims were "frivolous and patently without merit."

¶ 48 This appeal followed.

¶ 49 ANALYSIS

¶ 50 On appeal from the trial court's summary dismissal of his postconviction petition, defendant argues only one of the issues raised in his postconviction petition—that counsel was ineffective for failing to interview and call Brooks as a witness at trial. Defendant also argues for the first time on appeal the 20-year firearm enhancement to his attempt murder sentence violated the Proportionate Penalties Clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) as applied to him.

¶ 51 Defendant's petition was summarily dismissed at first stage proceedings; our review of the trial court's judgment is *de novo*. *People v. Patterson*, 2018 IL App (1st) 160610, ¶ 14.

¶ 52 ANALYSIS

¶ 53 Post-Conviction Hearing Act

¶ 54 The Act (725 ILCS 5/122-1 *et seq.* (West 2018)) provides a mechanism for collateral attack of a conviction or sentence by allowing for inquiry into constitutional claims relating thereto which were not, and could not be, adjudicated during the trial or determined on appeal. *People v. House*, 2019 IL App (1st) 110580-B, ¶ 25. The Act sets forth a three-stage process for hearing constitutional claims. *Patterson*, 2018 IL App (1st) 160610, ¶ 15. Defendant's claim was dismissed at the first stage.

> "At the first stage, the circuit court independently reviews the petition and determines whether the petition is frivolous or patently without merit. [Citations.] A petition may be summarily dismissed at the first stage as frivolous and patently without merit 'only if the petition has no arguable basis either in law or in fact.' [Citation.] *** Because most petitions at the first stage are drafted by defendants with little legal knowledge or training, a defendant need only present a limited amount of detail in the petition to survive summary dismissal by the circuit court. [Citation.] That is, defendants only need to set forth the 'gist' of an arguably constitutional claim to meet the relatively low factual threshold to satisfy the first stage under the Act. [Citation.]" *Id.*

¶ 55 A petition lacking an arguable basis in law or fact is one based on an indisputably meritless legal theory or fanciful allegations such as a claim completely contradicted by the record or based on fantastic or delusional facts. *People v. Brown*, 236 Ill. 2d 175, 185 (2010).

¶ 56 In first-stage postconviction proceedings the defendant is not required to make "a substantial showing of a constitutional violation" nor is the defendant required to "demonstrate" or "prove" the alleged constitutional violation to avoid dismissal. *People v. Tate*, 2012 IL 112214, ¶ 19. At the pleading stage of postconviction proceedings, all well-pleaded allegations

in the petition and supporting affidavits that are not positively rebutted by the trial record are to be taken as true. *People v. Robinson*, 2020 IL 123849, ¶ 45. With these principles in mind, we consider those claims raised by defendant on appeal.

¶ 57                                 Ineffective Assistance of Counsel

¶ 58    Defendant first argues trial counsel was ineffective for failing to investigate and call Brooks as a witness at trial to counter the State's evidence and support defendant's self-defense claim. For the reasons set forth below, defendant's argument fails.

¶ 59    Criminal defendants have a constitutional right to effective assistance of counsel, and claims alleging ineffective counsel are governed by the standards set forth in *Strickland v. Washington*, 466 U.S. 668 (2004). *People v. Veach*, 2017 IL 120649, ¶ 29. "At the first stage of postconviction proceedings under the Act, a petition alleging ineffective assistance may not be summarily dismissed if (i) it is arguable that counsel's performance fell below an objective standard of reasonableness and (ii) it is arguable that the defendant was prejudiced." *People v. Hodges*, 234 Ill. 2d 1, 17 (2009).

> " '[A] defendant must show that counsel's performance was objectively
> unreasonable under prevailing professional norms and that there is a "reasonable
> probability that, but for counsel's unprofessional errors, the result of the
> proceeding would have been different." ' [Citation.] 'A "reasonable probability"
> is defined as "a probability sufficient to undermine confidence in the outcome." '
> [Citation.]" *Veach*, 2017 IL 120649, ¶ 30.

¶ 60    Both prongs of the *Strickland* test must be satisfied to succeed on a claim of ineffective counsel (*id.*), and as such, "a court need not 'address both components of the inquiry if the

defendant makes an insufficient showing on one.' " *People v. Montgomery*, 192 Ill. 2d 642, 671 (2000).

¶ 61    "[D]ecisions concerning whether to call certain witnesses on a defendant's behalf are matters of trial strategy, reserved to the discretion of trial counsel" and "enjoy a strong presumption that they reflect sound trial strategy, rather than incompetence[.]" *People v. Enis*, 194 Ill. 2d 361, 378 (2000).  For this reason, counsel's decisions in this regard are "generally immune from claims of ineffective assistance of counsel." *Id*.  Additionally, counsel cannot be deemed ineffective where the defendant's underlying claim is not meritorious.  *Id*.

> "It is well settled that trial counsel has a professional duty to conduct reasonable investigations and independently investigate any possible defenses. *Strickland*, 466 U.S. at 691.  Further, '[l]ack of investigation is to be judged against a standard of reasonableness given all of the circumstances, "applying a heavy measure of deference to counsel's judgments." ' [Citations.]" *People v. Viramontes*, 2016 IL App (1st) 160984, ¶ 56.

¶ 62    The State argues defendant's petition is deficient because "Brooks's affidavit makes no reference to his potential availability or willingness to testify at a future trial" and in support cites *People v Brown*, 371 Ill. App 3d 972, 982 (2007) *overruled on other grounds by People v. Young*, 2018 IL 122598; *People v. Hobley*, 182 Ill. 2d 404, 455 (1998); and *People v. Jones*, 399 Ill. App. 3d 341, 366-67 (2010).  We agree.

¶ 63    In *Brown*, the defendant argued he was entitled to an evidentiary hearing on his claim of ineffective assistance of counsel based on trial counsel's failure to present an alibi defense. *Brown*, 371 Ill. App. 3d at  980.  Specifically, the defendant attached the affidavit of his co-defendant averring the "defendant was not present when the offense occurred, and that he

presented this information to counsel prior to trial, but was not called to testify." *Id*. at 981. The trial court found the co-defendant's affidavit insufficient to warrant an evidentiary hearing because the co-defendant's affidavit "d[id] not affirmatively aver that he would have testified to the contents of his affidavit at [the] defendant's trial" and, in doing so, "would have waived his right against self-incrimination." *Id*. at 982. This court held:

> "With respect to codefendant Smith, we find that his affidavit is insufficient to merit further consideration. Smith was a codefendant who was tried simultaneously to defendant in a severed trial and was convicted of murder and armed robbery. *** An affidavit must not only identify the source and character of the evidence, it must also identify the availability of the alleged evidence. [Citation.] Here, Smith does not indicate that he would have waived his right against self-incrimination. Accordingly, after scrutinizing the pleadings, the affidavits, as well as the State's motion to dismiss, defendant's claim of ineffective assistance of counsel for failure to call these witnesses to testify must fail." *Id.*

¶ 64    *Hobley* involved a postconviction petition allegation of ineffective assistance of trial counsel where the defendant claimed counsel failed to secure testimony of the defendant's paramour. *Hobley*, 182 Ill. 2d at 454. This court concluded "there ha[d] been no showing that [the witness] could have been found by defense counsel, or that she would have been willing to testify on defendant's behalf had she been located" and "the absence of these averments suggests exactly the opposite." *Id.*

¶ 65    The same holding is found in *Jones* which cites to *Brown* and concludes the proposed witness's affidavit was flawed "because it did not contain a statement that [the witness] would

actually testify to the facts alleged in the affidavit." *Jones*, 399 Ill. App. 3d at 366-67. There, this court held an affidavit insufficient to merit consideration at a hearing because it did not affirmatively aver the affiant would have testified to the contents of his affidavit at the defendant's trial. See also *People v. Johnson*, 183 Ill.2d 176 (1998) (" 'allegations must be accompanied by an affidavit which identifies with reasonable certainty the source, character, and availability of the alleged evidence.' [Citations.]"). Although the foregoing decisions relate to second- or third-stage proceedings, because the requirements of affidavits are basic, there is a dearth of authority suggesting a different interpretation should govern first-stage dismissals." *Jones*, 399 Ill. App. 3d at 366–67.

¶ 66    Brooks's affidavit shows he was willing and available to testify at defendant's original trial. However, there is no specific averment that Brooks would testify on defendant's behalf at a new trial. Thus, Brooks's affidavit is insufficient because it does not expressly state that Brooks would be willing to testify on defendant's behalf should defendant be granted a new trial. *Cf. People v. Gonzalez*, 407 Ill. App. 3d 1026, 1032 (2011) ("She never spoke with the defendant's attorneys. She was never asked for a statement in the case and she was not subpoenaed. She would have testified on the defendant's behalf had she been asked. *** She prepared an affidavit on August 22, 2006, in an effort to help the defendant. *She would be willing to testify at a new trial if one were granted.*" (Emphasis added.)). Nonetheless this is not the only basis for our decision the trial court properly summarily dismissed the petition.

¶ 67    On the merits of the claim, turning to the first prong of the *Strickland* test— that is, if it is arguable that counsel's performance fell below an objective standard of reasonableness (see *Hodges*, 234 Ill. 2d at 17—the State claims defendant has not shown trial counsel failed to

investigate Brooks and has not overcome the presumption the decision not to call Brooks as a witness was a strategic trial decision.

¶ 68 Initially, as to the question of whether Brooks was interviewed by trial counsel, defendant argues on appeal "there is no record evidence that trial counsel ever consulted with Brooks or knew the content of his expected testimony." Thus, defendant argues, his petition "states an arguable claim that trial counsel did not have all the facts necessary to make a reasonable strategic assessment on whether Brooks's testimony would be useful." The State responds defendant "offers no support for this proposition" where the affidavit "does not make any representation that trial counsel failed to interview him 'fully,' or otherwise, prior to the trial." "The burden is on the defendant to establish both his trial counsel's incompetence and the resultant prejudice." *People v. Williams*, 262 Ill. App. 3d 808, 825 (1994)

¶ 69 Defendant made the following statements in his verified postconviction petition:

"Petitioner['s] trial counsel's performance was deficient in that it fell below an objective standard of reasonableness, *when trial counsel fail[ed] to properly investigate witness, Romalice Brooks,* who was located in the backseat of the victim's [(Adam Hollingsworth)] car at the time of the in[]cident Brooks had informed trial counsel that he was a witness of the crime \*\*\*. *Trial counsel informed Brooks that he would not be needed, without fully interviewing Brooks on what he would have testified to.*

\* \* \* \*

Petitioner's trial counsel's performance prejudiced the defense in that *trial counsel's errors deprived the defendant of a fair trial when trial counsel failure (sic) to investigate witness Romalice Brooks.*

- 19 -

*  *  *  *

> *Due to trial counsel's failure to investigate Romalice Brooks, Petitioner's trial counsel did not inform Petitioner, that he had spoken with witness Romalice Brooks.*"  (Emphases added.)

¶ 70    The petition and affidavit allege trial counsel was aware Brooks was a witness and Brooks was available to trial counsel, but that trial counsel failed to "fully" interview Brooks prior to making the decision not to call him as a trial witness.  The failure to "fully" interview Brooks—whatever its meaning—does not equate to an allegation defendant's trial counsel failed to investigate Brooks or did not know what Brooks would testify to before counsel made the strategic decision not to call him as a witness.  The affidavit does not aver defendant's trial attorney lacked *any* knowledge of Brooks' proposed testimony.  Irrespective of defense counsel's knowledge of Brooks's proposed testimony, defendant's argument fails.

¶ 71    The question becomes whether the decision not to call Brooks was arguably objectively deficient or arguably prejudiced defendant.  We hold it is not arguable counsel's performance was objectively unreasonable or prejudiced defendant; therefore, the petition fails to pass the test of "whether it is arguable that counsel's performance fell below an objective standard of reasonableness and whether it is arguable that the defendant was prejudiced." *People v. Tate*, 2012 IL 112214, ¶ 22.  Even "a mistake in trial strategy or an error in judgment by defense counsel will not alone render representation constitutionally defective.  [Citation.]  'Only if counsel's trial strategy is so unsound that he entirely fails to conduct meaningful adversarial testing of the State's case will ineffective assistance of counsel be found.'  [Citations.]" *People v. Peterson*, 2017 IL 120331, ¶ 80.

¶ 72    In this case, there was no question of whether defendant shot the victim.  The issue was whether defendant's actions could be *justified* by self-defense.  A person is "justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony."  720 ILCS 5/7-1(a) (West 2018).  Brooks's testimony would show the intoxicated Hollingsworth intended to *scare* defendant and those standing near him by speeding the vehicle toward them with headlights off.  After defendant started shooting Hollingsworth jumped from the vehicle yelling that he was "only playing."  Brooks's testimony could have *undermined* the defense of self-defense because Brooks's testimony would make it less likely deadly force was necessary to prevent imminent death or great bodily harm to defendant or another, not more likely.

¶ 73    Defendant argues that Brooks's testimony that Hollingsworth was to "scare" defendant and was "just playing" provided evidence that Hollingworth "directed the vehicle *** in a manner that would cause a reasonable person to be in fear for his life."  Certainly, defense counsel could have made that argument; however, it is only that—an argument based on the evidence Hollingsworth only intended to scare defendant (which carries the implication he was in sufficient control of his faculties to control his actions in spite of Brooks's proposed testimony of Hollingsworth's intoxication).  We cannot say it falls below prevailing professional norms for defense counsel to fear the State would argue, and the trier of fact would find, it was *not* reasonable for defendant to open fire on an occupied vehicle and shoot not only the driver but also another occupant—a conclusion that, as the State notes, is consistent with the testimony contradicting defendant's and Brooks's accounts of events, further bolstering counsel's strategic decision not to call Brooks.  See generally *People v. Meyers*, 2016 IL App (1st) 142323, ¶ 29

("We believe that declining to call an alibi witness whose testimony could be contradicted by the defendant's own postarrest statements as to his whereabouts falls within the realm of reasonable trial strategy, even if the known alibi witness had never been interviewed."); *People v. Jefferson*, 345 Ill. App. 3d 60, 77 (2003) ("As the time of the defendant's phone calls does not support an inference that the defendant *could not* have committed the murder, it was not ineffective assistance by trial counsel to fail to argue such an inference." (Emphasis added.)).

¶ 74    Therefore, we cannot find it arguable that defense counsel's decision not to call Brooks was fell below an objective standard of reasonableness under prevailing professional norms (see generally *People v. Rodriguez*, 2018 IL App (1st) 160030, ¶ 59 ("we cannot find that trial counsel's performance was 'objectively unreasonable under prevailing professional norms' for not further investigating and not calling this proposed alibi witness.")).

¶ 75    Nor can we find that it is arguable defendant was prejudiced by the failure to call Brooks (see generally *Viramontes*, 2016 IL App (1st) 160984, ¶ 56 (no prejudice from manner in which defense counsel presented possible defense). See also *Meyers*, 2016 IL App (1st) 142323, ¶ 29 (finding that counsel's conduct "falls within the realm of reasonable trial strategy, *even if the known alibi witness had never been interviewed*." (Emphasis added.)). Defense counsel conducted meaningful adversarial testing of the State's case against defendant by arguing defendant acted in self-defense. Counsel made the strategic choice not to call a witness who, while offering an additional perspective on events, may have actually defeated that chosen defense—the choice of which has not been challenged. It is not arguable that decision was constitutionally defective. See generally *Peterson*, 2017 IL 120331, ¶ 80.

¶ 76    Furthermore, it is not arguable that decision prejudiced defendant. The trier of fact rejected the argument defendant acted in self-defense believing he was about to be the victim of

a drive-by shooting *without* evidence "from inside the car" that the driver was not engaged in a drive-by shooting, had no intent to harm defendant, and was "just playing" when, if it occurred, he accelerated toward defendant. Defendant's argument the decision not to call Brooks prejudiced him would require us to find it is arguable there is a reasonable probability the trier of fact would have accepted defendant's argument *with* that evidence. We find it is not arguable that had defense counsel made the strategic decision to call Brooks just to provide evidence the car did speed toward defendant but not while engaged in a drive-by shooting and with no intent to harm defendant (regardless of Brooks' *opinion* defendant "saved lives") it is so probable the outcome of the proceeding would have been different that it undermines our confidence in the verdict.

¶ 77 Accordingly, the trial court properly summarily dismissed defendant's ineffective assistance of counsel claim at the first stage of postconviction proceedings. *People v. Knapp*, 2020 IL 124992, ¶ 46 ("A postconviction petition alleging ineffective assistance of counsel should not be summarily dismissed if (1) it is arguable that counsel's performance fell below an objective standard of reasonableness and (2) it is arguable that the petitioner was prejudiced.").

¶ 78                              Proportionate Penalties Clause

¶ 79 Defendant argues for the first time on appeal that the mandatory 20-year firearm enhancement added to his attempt (first degree murder) sentence violated the Proportionate Penalties Clause of the Illinois Constitution as applied to him where he was 17-years old at the time of the offense but "the sentencing decision fails to account for [defendant's] age at the time of the offense, the surrounding environment, and [defendant's] ability to rehabilitate himself." Where a "[d]efendant challenges the constitutionality of his sentence and argues that it violates the proportionate penalties clause of the Illinois Constitution as applied to him" this court will

"review this issue *de novo*." *People v. Charleston*, 2018 IL App (1st) 161323, ¶ 33. We have recognized three different forms of proportionality review. "A statute may be deemed unconstitutionally disproportionate if (1) the punishment for the offense is cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community; (2) similar offenses are compared and the conduct that creates a less serious threat to the public health and safety is punished more harshly; or (3) identical offenses are given different sentences. [Citations.]" *People v. Miller*, 202 Ill. 2d 328, 338 (2002). "[A]n as-applied constitutional challenge *** is a legal question that we review *de novo*." *People v. Johnson*, 2018 IL App (1st) 140725, ¶ 97.

¶ 80    For the following reasons we hold defendant is not barred from raising his as applied constitutional challenge to his sentence on appeal from the summary dismissal of his *pro se* postconviction petition, but defendant has failed to state an arguable claim his sentence violates the Proportionate Penalties Clause of the Illinois Constitution because defendant did not receive a *de facto* life sentence.

¶ 81    "A proportionality challenge derives from article I, section 11, of the Illinois Constitution of 1970. Section 11, which is commonly referred to as the Proportionate Penalties Clause, provides that '[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship.' Ill. Const. 1970, art. I, § 11. A defendant can raise a proportionate penalties challenge on the basis that the penalty for a particular offense is too severe under the 'cruel or degrading' standard or that the penalty is harsher than the penalty for a different offense that contains identical elements. [Citation.]" *People v. Williams*, 2015 IL 117470, ¶ 9. "[T]he trial court undoubtedly could impose an enhanced sentence on a young adult offender if it complied with the constitutional prerequisite of

considering the offender's youth." See *People v. Ruiz*, 2020 IL App (1st) 163145, ¶ 42, citing *People v. Buffer*, 2019 IL 122327, ¶ 42. Whether a penalty is disproportionate as applied to a young adult is based on the particular circumstances of the offense and the individual characteristics of the youthful offender and how *youth* (not age) impacts those characteristics. When it comes to young adults, to make a proportionate penalties determination courts should consider "the *Miller* principles." Those principles have provided "objective factors" that inform our judgment as to whether even a discretionary *de facto* life sentence of a young adult offender constitutes a punishment that is "cruel, degrading, or so wholly disproportioned to the offense as to shock the moral sense of the community." (Internal quotation marks and citations omitted.) *People v. Leon Miller*, 202 Ill. 2d 328, 339-40 (2002).

¶ 82    As previously stated defendant raises this claim for the first time in this appeal. Defendant acknowledges the rule that an as-applied constitutional challenge to a sentence must initially be raised in the trial court. Defendant correctly relies upon our supreme court's decision in *People v. Holman*, 2017 IL 120655, in which our supreme court held that

> "*Thompson* instructs that a defendant must present an as-applied constitutional challenge to the trial court in order to create a sufficiently developed record. *Davis* creates a very narrow exception to that rule for an as-applied *Miller* claim for which the record is sufficiently developed for appellate review." *Holman*, 2017 IL 120655, ¶ 32.

¶ 83    Here, defendant relies upon the exception when the record is sufficiently developed to permit review and argues that in this case, "the record is sufficiently developed for appellate review because the record contains [defendant's] age at the time of the offense, the circumstances surrounding the offense, and a comprehensive PSI."

> "Similar to [but distinct from] the eighth amendment, a challenge under the proportionate penalties clause of the Illinois Constitution contends that the penalty in question was not determined according to the seriousness of the offense. [Citations.] A defendant's sentence is in violation of the proportionate penalties clause where the penalty imposed is cruel, degrading, or so wholly disproportionate to the offense committed as to shock the moral sense of the community. [Citations.] To determine whether a sentence shocks the moral sense of the community, we must consider objective evidence as well as the community's changing standard of moral decency. [Citation.]" *People v. Villalobos*, 2020 IL App (1st) 171512, ¶ 67.

This court will review a *Miller*-based challenge to a mandatory firearm enhancement under our Proportionate Penalties Clause even where the sentence does not violate the eighth amendment to the United States Constitution. See, *e.g.*, *People v. Woods*, 2020 IL App (1st) 163031, ¶ 60.

¶ 84 As to the merits of defendant's claim, the question for this court is whether defendant "has presented an arguable claim that his sentence[] *** violate[s] the proportionate penalties clause of the constitution." *People v. Toy*, 2013 IL App (1st) 120580, ¶ 21. "We are at the pleading stage, so [defendant] is not required to prove anything. He needs only to plead facts justifying further proceedings" *People v. Ruiz*, 2020 IL App (1st) 163145 ¶ 55 (concerning motion for leave to file successive postconviction petition).

¶ 85 First, we note that "a prison sentence of 40 years or less imposed on a juvenile offender does not constitute a *de facto* life sentence in violation of the eighth amendment." *Buffer*, 2019 IL 122327, ¶ 41. Second, we note that "[i]n a thread of cases, this court has determined that the effect of the statutory mandatory firearms enhancement in sentencing offenders who were

juveniles at the time of the crime interfered with the judge's discretion and violated the proportionate penalties clause of the Illinois Constitution because it 'shocks our evolving standard of moral decency.' [Citation.]" *People v. Othman*, 2019 IL App (1st) 150823, ¶ 84.

¶ 86    Here, as with similar cases, defendant relies on "the 'evolving science' on juvenile maturity and brain development that formed the basis of the *Miller* decision to ban mandatory natural life sentences for minors." *People v. Thompson*, 2015 IL 118151, ¶ 38. Defendant argues "[a]pplication of the reasoning from *Miller*, *Barnes*, and *Aikens* to [defendant's] case show that automatically treating [defendant] as a fully mature adult by applying the 20-year firearm enhancement sentencing overlooks the influences that his youth and environment had on his crime, and his ability to rehabilitate himself following a single and  isolated impulsive act." To make the required showing on the substance of the claim defendant must show "how that science applies to the circumstances of defendant's case, the key showing for an as-applied constitutional challenge." *Thompson*, 2015 IL 118151, ¶ 38. "Undoubtedly, the trial court is the most appropriate tribunal for the type of factual development necessary to adequately address defendant's as-applied challenge." *Id*, at ¶ 38. Nonetheless, the reasoning from *Miller*, *Barnes*, and *Aikens* applies to youthful offenders who receive *de facto* life sentences of imprisonment. See *People v. Villalobos*, 2020 IL App (1st) 171512, ¶ 60 (citing *Miller*, 567 U.S. at 469); *Aikens*, 2016 IL App (1st) 133578, ¶¶ 35-36 (relying on *Leon Miller*, 202 Ill. 2d at 341 and *People v. Gipson*, 2015 IL App (1st) 122451, ¶ 78); *Barnes*, 2018 IL App (5th) 140378, ¶¶ 21-22, 25 (relying on *Aikens*) .

¶ 87    Based on the aforementioned "thread of cases" we find that defendant's proportionate penalties claim lacks an arguable basis in law and the legal theory is without merit where the law at issue applies to *de facto* life sentences. Defendant has pointed to no authority and indeed

makes no argument to expressly extend this line of reasoning to lengthy prison sentences imposed on youthful offenders. Defendant has not demonstrated a constitutional infirmity that would necessitate relief under the Act. *Toy*, 2013 IL App (1st) 120580, ¶¶ 17-18. The trial court's judgment summarily dismissing defendant's petition for postconviction relief is affirmed.

¶ 88                                            CONCLUSION

¶ 89      For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 90      Affirmed.