2024 IL App (1st) 191374-UB

SECOND DIVISION
October 15, 2024

No. 1-19-1374

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 21181 |
| | ) | |
| DAVEED LAZARD, | ) | Honorable |
| | ) | William G. Gamboney, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE HOWSE delivered the judgment of the court.
Presiding Justice Van Tine and Justice McBride concurred in the judgment.

ORDER

¶ 1    *Held*:   The judgment of the circuit court of Cook County summarily dismissing defendant's postconviction petition is reversed; defendant stated an arguable claim his sentence violates the proportionate penalties clause of the Illinois constitution as applied to him where the trial court sentenced defendant without consideration of the circumstances of his youth, obviating the need to address defendant's remaining issues.

¶ 2    The circuit court of Cook County convicted defendant, Daveed Lazard, of attempt first degree murder, aggravated battery with a firearm, and aggravated discharge of a firearm for firing into a vehicle and striking Tamika Readus and sentenced him to 32 years' imprisonment. Defendant was 17-years old at the time of the offense. This court affirmed his conviction and sentence on direct appeal. Thereafter, defendant filed a postconviction petition which the trial court summarily dismissed. In his postconviction petition, defendant's arguments included a claim his trial counsel was ineffective for failing to fully investigate and use witness Romalice

Brooks to contradict the State's evidence and support defendant's claim of self-defense. Defendant also argued for the first time on appeal that the 20-year firearm enhancement to his attempt murder sentence violates the proportionate penalties clause of the Illinois constitution (Ill. Const. 1970, art. I, § 11) as applied to him. For the following reasons, we reverse the summary dismissal of defendant's postconviction petition and remand for further proceedings.

¶ 3                                        BACKGROUND

¶ 4                                     Defendant's Trial

¶ 5     Below we recount the relevant evidence and details from defendant's trial as previously set forth by this court on direct appeal.

¶ 6     On June 16, 2013, defendant, his girlfriend, and other people were gathered outside their apartment building at a Father's Day barbeque. According to defendant, a car drove erratically and stopped right in front of defendant and crashed into another car. Defendant testified he pushed his girlfriend out of the way. Defendant then fired his gun multiple times at the car. The victim, Tamika Readus, was shot three times. The driver, Adam Hollingsworth who was Readus' husband, was shot once in the shoulder.

¶ 7     Two weeks after the shooting defendant approached Hollingsworth and Readus, and defendant told Readus he was sorry for shooting her. Readus then went to police with the name of the suspect. She later identified defendant from a photo array and a physical lineup as the person who told her he shot her. Defendant was arrested by police and given *Miranda* warnings. While he was being transported to the police station after his arrest, defendant told the transporting officers that he was sorry for shooting Readus and told them he had apologized to her. The State charged defendant with attempt (first degree murder), aggravated battery with a

firearm, and aggravated discharge of a firearm. Tamika Readus was the first witness to testify in the State's case in chief.

¶ 8                             Testimony of Tamika Readus

¶ 9     In June 2013, Readus was married to Hollingsworth. On the afternoon of June 13, 2013, Hollingsworth and Readus were preparing to go to a Father's Day barbeque near Washington Park. They arrived at the barbeque around 9 p.m. They stayed for a short amount of time and then left with two of Hollingsworth's cousins. Hollingsworth was driving the car. They were traveling toward Stony Island when they stopped at a stop sign on Park Shore East and 62nd Street. Readus testified Hollingsworth was driving normally, the car was operating normally, the headlights were operating normally, and she could tell by looking out the windshield the headlights were on. A person was crossing the street in front of them and they stayed stopped at the stop sign for some two or three minutes. Hollingsworth then abruptly accelerated to 25 or 30 miles per hour and made a left turn. He then braked hard and came to a stop behind another car parallel to the curb. Readus then saw smoke and a group of people started running. When she heard a noise, Readus thought she heard a firework going off from the group of people nearby. She looked down and saw that she was shot. Readus yelled to Hollingsworth that she had been shot. Hollingsworth was trying to get out of the car and when he heard Readus yell she had been shot, he drove her to the University of Chicago Hospital. While undergoing treatment at that hospital, Readus blacked out. When she awoke, she was in Mount Sinai Hospital. She had gunshot wounds in her chest, side, and lower back. Readus recalled speaking to Detective Vidas Nemickes while she was at the hospital, though she could not recall when. Readus was discharged from the hospital after one week.

¶ 10     After she had been discharged from the hospital, Readus and Hollingsworth went together to a barbeque near Jackson Park for the July 4th holiday. This was the same area where Readus had been shot. Hollingsworth sent someone to get defendant from a house, and defendant came out with a few other people. Defendant then began to apologize to Readus, telling her it was a mistake and "that they were at war with some people," though Readus could not recall his exact words. Readus began crying and defendant attempted to hug her. He then walked off and Hollingsworth told the group of people that defendant needed to be "violated." A member of the group then punched defendant in the face. Readus and Hollingsworth left the barbeque after.

¶ 11     When Readus returned to her parents' house, she called Detective Nemickes. She told him she knew who shot her: a person known as "Dallo" (Dallo was defendant's nickname). Readus required further medical treatment to remove another bullet from her back, which was removed at Mount Sinai Hospital in early July of 2013. She testified she still had the bullet stuck in her chest. After the surgery, Readus met with Detective Nemickes in July. She signed paperwork and was asked to look at a photographic array. She identified defendant's picture as a picture of the person who shot her.

¶ 12     Under cross-examination, Readus testified Hollingsworth was not driving responsibly on June 13, 2013. She also testified that prior to going to the barbeque at 9 p.m., they were "lay[ing] around the house," though neither of them was smoking or drinking. Readus testified Hollingsworth does not drink or smoke.

¶ 13                         Testimony of Detective Majdi Shalabi

¶ 14     Detective Shalabi received an assignment from Detective Nemickes to apprehend defendant on suspicion of shooting Readus. On July 17, 2013, Detective Shalabi and his partner, Officer Joseph Tracy, went to defendant's home and placed him in custody. Detective Shalabi

testified he then read defendant his *Miranda* warnings. Defendant was then placed in the back seat of the detective's car. While Detective Shalabi and his partner were driving defendant to the police station, defendant began speaking to them. Detective Shalabi testified he did not initiate the conversation with defendant. Defendant told Detective Shalabi that he did not mean to shoot the lady and that he gave her a hug and said he was sorry. At that point Detective Shalabi again read defendant his *Miranda* warnings and told defendant to stay quiet until his mother or another parent or guardian was present. Detective Shalabi then called defendant's mother. Once they transported defendant to the area central detective division, they handed defendant over to Detective Nemickes. Detective Shalabi did not have further contact with this case until October 9, 2013, when he went to arrest defendant at Hyde Park High School.

¶ 15                           Testimony of Detective Vidas Nemickes

¶ 16    Detective Nemickes testified he received an assignment on June 16, 2013, to report to the University of Chicago hospital because two people had been shot.

¶ 17    Detective Nemickes spoke with Readus on June 19, 2013. On July 3, 2013, Detective Nemickes spoke with Readus a second time because Readus called him and informed him she knew the identity of her shooter. Detective Nemickes then reached out to Hollingsworth, but Hollingsworth was not cooperative. On July 11, 2013, Detective Nemickes met with Readus at his office to show her a photographic array. She identified defendant in one of the photos and told the detective that was the person who apologized for shooting her. Detective Nemickes next met with Readus at the police station on the night of July 17, 2013, in order to view a physical lineup. Readus viewed the lineup at around 1 a.m. on July 18, and immediately identified defendant as the person who apologized to her for shooting her.

¶ 18    Although Detective Nemickes was unable to locate the weapon used to shoot Readus, he was able to recover a fired bullet that was recovered from Readus's body. He did not recover any shell casings from the crime scene. After admitting exhibits into the record, the State rested.

¶ 19    Defendant's trial counsel made a motion for directed finding after the close of the State's case.  The trial court denied this motion.

¶ 20                            Testimony of Adam Hollingsworth

¶ 21    Hollingsworth was the first witness to testify for the defense. Hollingsworth testified he was at his home with Readus, along with their uncle and his wife, on the afternoon of June 16, 2013. They were playing cards and drinking hard liquor. Hollingsworth testified he began drinking at 11 a.m. that day. Prior to leaving his house, Hollingsworth consumed two or three cups of liquor. At around 3 p.m. Hollingsworth and Readus drove to a barbeque in Washington Park.  They were at the barbeque in the park for a couple of hours. Hollingsworth was with family and drinking more liquor. When it began to turn dark outside, Hollingsworth left with Readus and two of his cousins to go to another barbeque close to Hyde Park, near Stony Island and 61st.

¶ 22    Hollingsworth testified he was driving a green Suzuki and was driving in a reckless manner. He stated he "was driving wild." Hollingsworth "was driving reckless, and I had hit the corner without hitting the brakes. Well, I thought I hit the brakes. But the next thing you know, I had -- I don't know.  I had passed out. * * * I remember hitting the sidewalk." He was speeding, going about 45 miles per hour in a 25 mile per hour speed zone. He did not recall whether he had his headlights on that night. Hollingsworth had consumed some five or six cups of hard liquor by that point. He remembered turning onto a street before hitting the sidewalk but could not remember whether he stopped at the stop sign. He recalled hitting the gas and turning when he

got to the stop sign. Hollingsworth passed out from intoxication after hitting the curb. The pain from being shot brought Hollingsworth to, and he realized he had stopped his car on the sidewalk next to a driveway. After he and Readus were shot, Hollingsworth drove them to the University of Chicago hospital. Hollingsworth had been shot in the shoulder and the bullet was not taken out. He released himself from the hospital after he was treated.

¶ 23    Two days after Hollingsworth left the hospital he received a Facebook message from defendant. A few days later, defendant met with Hollingsworth and gave him some money for the broken windshield in Hollingsworth's car. Defendant also apologized for shooting Hollingsworth and Readus. Hollingsworth testified defendant was a friend of his.

¶ 24    Shortly after the July 4th holiday, Hollingsworth met with Detective Nemickes at the police station. Detective Nemickes showed Hollingsworth a photo of defendant and Hollingsworth told the detective that this was not the person who shot him. On redirect examination, Hollingsworth was shown a photo of his car taken by police the night of the shooting while Hollingsworth was in the hospital. Hollingsworth identified a cup in the center front console as the cup he was drinking out of that night and said that there was alcohol in it.

¶ 25                         Testimony of Behname Pierce

¶ 26    Pierce testified he was at Park Shore East and 62nd, at the Park Shore East Apartments, on June 16, 2013. He was standing outside with a few of his friends at around 9:45 or 10 p.m. and saw defendant across the street. Defendant was with a group of people outside at a Father's Day picnic. Pierce then "saw a dark colored car speeding from around the corner from behind" Hyde Park High School. The car had its headlights off, failed to stop at the stop sign, sped around the corner, hit the brake, and made a loud screeching noise. Pierce thought the car was traveling over the speed limit, moving about 40 or 50 miles per hour. The car ran into the back of

a parked car defendant was standing next to. Pierce testified that when the dark colored car ran into the back of a parked car, he and his friends "all ducked and ran inside Park Shore East Apartments." Pierce heard "about two, three gunshots," though he did not see who did the shooting. Pierce began to run before the gunshots "because normally when a car comes around the corner, headlights off, that fast, it normally – it's a drive-by. That's the first thing that come to mind. So my first intention was to run." After the car drove off, Pierce returned outside. His friends and other people were back outside, making sure nobody had been shot.

¶ 27                              Testimony of Raven Gilliam

¶ 28     Gilliam, 17-years old at the time of the trial, testified she had been in a relationship with defendant for the past three years. They had a child together, who was one year old at the time. On June 16, 2013, Gilliam was with defendant outside on 62nd and Park Shore East before 10 p.m. They were standing close to the parking lot entrance to the apartment complex with one of Gilliam's friends. About 30 people were around outside.

¶ 29     Gilliam saw a car coming down Park Shore East towards her. The car did not have its headlights on, failed to stop at the stop sign, and was going about 35-40 miles per hour. The stop sign was about 25 feet from where Gilliam, her friend, and defendant were standing. The car drove onto the curb close to where they were standing. When the car got to within inches of Gilliam, defendant pushed her out of the way. She was face down in the grass when she heard gunshots, though she could not remember how many shots were fired. After she heard the gunshots, everyone in the area ran in different directions.

¶ 30                              Defendant's Testimony

¶ 31     On June 16, 2013, at about 9:45 p.m., defendant was outside near 62nd and Park Shore East. He was standing with his girlfriend, Gilliam, and one of her friends. They were about 15

feet from the parking lot entrance. While they were talking, defendant heard someone say, "watch out," and he turned to see a car coming towards them. The car failed to stop at a stop sign, turned left off of Park Shore East, had no headlights on, and drove recklessly -- traveling about 40-50 miles per hour. Defendant saw the car when it was about 28 feet away. Seconds later, the car was driving onto the curb within 5 feet of defendant. He pulled out his gun and pushed Gilliam out of the way. Once he pushed Gilliam out of the way, defendant started shooting at the car. He believed someone in the car was about to do a drive-by shooting or hit them with the car. After he finished firing his weapon, defendant ran away.

¶ 32    On cross-examination, defendant testified he could have run from the car when it was approaching him. He fired at the car when it was about 20 feet from him and coming towards him. When the car came onto the curb he started running away from the car and shooting at it. Defendant also testified he did not think the car was in danger of hitting him. He did not see anyone with a weapon in the vehicle and nobody in the car lowered their windows. That same night, defendant threw his gun in Lake Michigan. The gun was not recovered.

¶ 33    Defendant had known Hollingsworth prior to the shooting. Two days after the shooting, defendant contacted Hollingsworth. He met with Hollingsworth and a woman who was with Hollingsworth in late June. Defendant then rested his case-in-chief.

¶ 34                    Rebuttal Testimony of Officer Ford

¶ 35    Officer Ford testified that when he responded to the shooting at 62nd and Park Shore East, he did not observe the grass near the curb to be disturbed as if some car had driven on it. When Officer Ford was at the University of Chicago hospital and had an opportunity to see the car Hollingsworth had been driving the night of the shooting, he did not see any damage to the front side of the car. Officer Ford also testified he did not smell alcohol coming from

Hollingsworth when he asked Hollingsworth questions at the hospital. Hollingsworth was not acting inebriated, though he did appear to be injured.

¶ 36                          Rebuttal Testimony of Detective Nemickes

¶ 37    Detective Nemickes also did not observe any damage, other than the gunshots to the window and hood, to the vehicle Hollingsworth was driving. Detective Nemickes went to the scene of the crime after leaving the hospital. He did not observe any signs of grass being disturbed and did not see any skid marks or turned-up grass. Detective Nemickes did not observe any evidence of a crash.

¶ 38    After the State rested its case, defense counsel requested the jury be instructed as to self-defense. The trial court found there was "sufficient evidence to instruct the jury as to that offense.  So over the State's objection, the jury will be instructed." Defense counsel argued in closing argument that defendant acted in self-defense. Counsel argued that when a "car is driving like that in that neighborhood, you're afraid of a possible drive-by shooting." The State objected and the trial court overruled the State's objection.

¶ 39    The jury found defendant guilty of attempt (first degree murder), aggravated battery with a firearm, and aggravated discharge of a firearm. *People v. Lazard*, 2018 IL App (1st) 160047-U, ¶¶ 4-40.

¶ 40                          Defendant's Sentencing Hearing

¶ 41    With respect to defendant's sentencing, our prior decision set forth the following facts:

> "The court ordered a presentence investigation report. At the sentencing
>
> hearing the state argued defendant's prior gang involvement was an aggravating
>
> factor. Defense counsel argued for mitigating factors, stating defendant had not
>
> been arrested before and pointing to defendant's academic achievements while in

custody. Counsel requested the minimum sentence. The court sentenced defendant to 12 years' imprisonment for attempt (first degree murder) with an additional 20-year enhancement for personally discharging a firearm. The court merged defendant's convictions for aggravated battery with a firearm with his conviction for attempt (first degree murder). For aggravated discharge of a firearm, the court sentenced defendant to 12 years' imprisonment, to run concurrently with his sentence for attempt (first degree murder). Defense counsel made an oral motion to reconsider the sentence because of defendant's lack of criminal history, requesting the minimum sentence. The court denied the motion to reconsider and granted defendant's leave to file notice of appeal." *Id*. ¶ 40.

¶ 42                                    Direct Appeal

¶ 43    On direct appeal, defendant argued "his conviction  for attempt (first degree murder) should be vacated because [(1)] the evidence at trial showed he had an unreasonable belief in the need to use deadly force in self-defense" and (2) "he was deprived of his constitutional right to the effective assistance of counsel because his trial counsel did not request the jury be instructed to acquit if it found defendant had an unreasonable belief in the need to use deadly force in self-defense."  See *id*. ¶ 42. Defendant further argued in his opening brief "he was entitled to a new sentencing hearing based on the retroactive application of the statutory change from mandatory [to discretionary] firearm sentencing enhancements for juveniles under 730 ILCS 5/5-4.5-105(b) (West 2016). See *id*. ¶ 43. However, defendant, in his reply brief, conceded *People v. Hunter*, 2017 IL 121306, resolved the issue finding "the change from mandatory to discretionary firearm sentencing enhancements for juveniles did not apply retroactively" such that "his argument for

retroactive application of the sentencing statute was no longer viable." See *Lazard*, 2018 IL App (1st) 160047-U, ¶ 43.

¶ 44                                    Postconviction Petition

¶ 45    On April 1, 2019, defendant filed a *pro se* postconviction petition pursuant to section 5/122-1 of the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 (West 2018)). In addition to contending he was denied a fair trial due to prosecutorial misconduct, defendant's postconviction petition argued his counsel was ineffective for (1) "failing to seek expert witness testimony at trial and on direct appeal and (2) failing to fully investigate and use witness Romalice Brooks, who was in the victim[']s car at the time of the [incident,] and who was willing to testify at trial, which would have contradicted the State's case and would have raised reasonable doubt." In addition to his own affidavit, defendant attached Brooks's affidavit which stated:

> "Pursuant to 28 U.S.C 17461 I Romalice Brooks declare under penalty of perjury that the following information is true and correct. During the time of the incident I was located in the back seat of a green Suzuki, 2001. On June 16, 2013, I was willing to testify at trial on behalf of Mr. Lazard. I made myself available for his attorney but was told I will not be needed. Recently I found out that Mr. Lazard was sentenced to 32 years. I honestly believe had I been called; my testimony would've made a difference in the outcome of Mr. Lazard's [trial]. My testimony would have been, I was sitting in the back seat and the only person sober out of Adam Hollingsworth, Rickey Rozelle, and Tomika Readus, who were all drinking. I constantly reminded Adam to turn on his headlights and telling him to stop driving so fast. Once we got to 62nd Street, Adam said "There

go Dallo, I'm about to scare his a[**]. Adam sped up and made a left turn. I shouted at him to slow down, while tapping on his shoulder. Adam was not responding as he drove towards a crowd of people who were on the sidewalk where he jumped the curb. I saw a female inches away from the front of the car. If Mr. Lazard had not start[ed] shooting Adam would have hit the crowd of people. Honestly, Mr. Lazard saved not only his life but everyone who was standing on the curb. Once we came to a stop, Adam got out the car and said, "It's me, Adam, I was just playing."

¶ 46    The trial court subsequently entered a judgment summarily dismissing defendant's postconviction petition finding defendant's claims were "frivolous and patently without merit."

¶ 47    In defendant's first appeal from the trial court's summary dismissal of his postconviction petition, defendant argued for the first time that the 20-year firearm enhancement to his attempt murder sentence violated the proportionate penalties clause of the Illinois constitution (Ill. Const. 1970, art. I, § 11) as applied to him because he was 17-years old at the time of the offense but "the sentencing decision fails to account for [defendant's] age ***, the surrounding environment, and [defendant's] ability to rehabilitate himself." This court initially held that defendant failed to state an arguable claim because he did not receive a *de facto* life sentence and affirmed the trial court's judgment. *People v. Lazard*, 2021 IL App (1st) 191374-U, ¶¶ 85-87.

¶ 48    Defendant filed a petition for rehearing in which he clarified his argument as to why he could raise an arguable claim under the proportionate penalties clause despite the absence of a *de facto* life sentence. On June 23, 2022, this court denied defendant's petition for rehearing.

¶ 49    On January 24, 2024, our supreme court issued a supervisory order directing this court to vacate our judgment and to consider the effect of our supreme court's opinion in *People v.*

*Hilliard*, 2023 IL 128186 on the issue of whether defendant may challenge his sentence under the proportionate penalties clause where the sentence is not a *de facto* life sentence and to determine if a different result is warranted. On March 12, 2024, we allowed defendant's motion for additional briefing.

¶ 50    This case was taken under advisement.

¶ 51                                ANALYSIS

¶ 52    On appeal from the trial court's summary dismissal of his postconviction petition, defendant argues for the first time that the 20-year firearm enhancement to his attempt murder sentence violates the proportionate penalties clause of the Illinois constitution (Ill. Const. 1970, art. I, § 11) as applied to him where he was 17-years old at the time of the offense but "the sentencing decision fails to account for [defendant's] age ***, the surrounding environment, and [defendant's] ability to rehabilitate himself."

¶ 53    Our supreme court has found postconviction proceedings to be the appropriate means to raise an as-applied challenge under the proportionate penalties clause that was not previously raised in the trial court. See *People v. Harris*, 2018 IL 121932, ¶ 48 (discussing as-applied proportionate penalties clause claim and concluding that "the defendant was not necessarily foreclosed from raising his as-applied challenge in another proceeding" and noting that "the Post-Conviction Hearing Act ([citation]) is designed to resolve constitutional issues" particularly those "which, by their nature, depend[ ] upon facts not found in the record." (Internal quotation marks omitted.)). Our supreme court has also held that a sentence that violates the proportionate penalties clause may be challenged at any time as void *ab initio*, including on appeal from the summary dismissal of a postconviction petition. *People v. Petrenko*, 237 Ill. 2d 490, 503 (2010),

*People v. Guevara*, 216 Ill. 2d 533, 542 (2005) ("If this [sentencing] provision violates the proportionate penalties clause, then it is void *ab initio*.").

¶ 54    Defendant has raised an as-applied challenge to his sentence under the proportionate penalties clause for the first time on appeal; therefore, the proper forum for his claim ordinarily should be in a successive postconviction petition. *Id*. This is so because our supreme "court has held that the void *ab initio* doctrine does *not* apply to an as-applied constitutional challenge." (Emphases in original.) *People v. Thompson*, 2015 IL 118151, ¶ 32. Furthermore, our supreme court has instructed that in postconviction proceedings, "claims not raised in a petition cannot be argued for the first time on appeal." *People v. Jones*, 213 Ill. 2d 498, 505 (2004). Normally, "[t]he proper forum for the claim is a successive postconviction action." *Id*. at 508-09.

¶ 55    But in this case, our supreme court issued a supervisory order to this court directing us to vacate our original judgment and "to consider *** the issue of whether defendant may challenge his sentence under the proportionate penalties clause." "[O]ur review of a case as a result of a supervisory order is limited by any instructions issued by our supreme court pursuant to the order." *People v. Grant*, 2014 IL App (1st) 100174-B, ¶ 39. This court is without discretion and must comply with our supreme court's supervisory orders. See *In re County of Kankakee*, 231 Ill. 2d 663 (2009) ("Failure to comply with this supervisory order in all respects will result in the appellate court's decision being summarily vacated and the cause remanded to a different panel of justices.").

¶ 56    Despite the fact defendant failed to raise a proportionate penalties clause claim in his postconviction petition before the trial court, and that he raises his as-applied proportionate penalties clause claim for the first time on appeal from the summary dismissal of that petition, we find that pursuant to the requirement to follow our supreme court's directions, we must

consider the issue of whether defendant can challenge his sentence under the proportionate penalties clause.

¶ 57     This court will review the trial court's judgment summarily dismissing a defendant's postconviction petition *de novo*. *People v. Patterson*, 2018 IL App (1st) 160610, ¶ 14. "[A]n as-applied constitutional challenge \*\*\* is a legal question that we review *de novo*." *People v. Johnson*, 2018 IL App (1st) 140725, ¶ 97. Therefore, where a "[d]efendant challenges [the summary dismissal of a postconviction petition based on] the constitutionality of his sentence, arguing that it violates the proportionate penalties clause of the Illinois constitution as applied to him," this court will "review this issue *de novo*." *People v. Charleston*, 2018 IL App (1st) 161323, ¶ 33.

> "A proportionality challenge derives from article I, section 11, of the Illinois Constitution of 1970. Section 11, which is commonly referred to as the proportionate penalties clause, provides that '[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship.' Ill. Const. 1970, art. I, § 11." *People v. Williams*, 2015 IL 117470, ¶ 9.

See also *People v. Clemons*, 2012 IL 107821, ¶¶ 39-41. We note the text of the Illinois constitution does not limit the applicability of the proportionate penalties clause to individuals who receive life sentences.

¶ 58     When proceedings on defendant's petition began and first came up for appeal, the question of whether a juvenile defendant who received less than a *de facto* life sentence could challenge their sentence under Illinois' proportionate penalties clause based on the *Miller* factors was unsettled. Different panels of this court had declined to extend *Miller* to sentences of less

than actual or *de facto* life imprisonment. See, *e.g.*, *People v. Hilliard*, 2021 IL App (1st) 200112, ¶ 47; *People v. Woods*, 2020 IL App (1st) 163031, ¶ 57. Our interpretation then was that these defendants could not challenge their sentences under the proportionate penalties clause by applying *Miller*. In this case, this court originally held "defendant *** failed to state an arguable claim his sentence violates the Proportionate Penalties Clause of the Illinois Constitution *because* defendant did not receive a *de facto* life sentence." (Emphasis added.) *People v. Lazard*, 2021 IL App (1st) 191374-U, ¶ 80.

¶ 59    Defendant filed a petition for rehearing on the question. We denied the petition.

¶ 60    As stated above, our supreme court subsequently directed this court to vacate its original judgment and reconsider its disposition in light of its decision in *People v. Hilliard*, 2023 IL 128186. In *Hilliard*, the defendant raised an as-applied constitutional challenge to a sentencing enhancement under the proportionate penalties clause. *Hilliard*, 2023 IL 128186, ¶ 23. Also in *Hilliard*:

> "[the] defendant was 18 years old when he committed the crime and filed an initial postconviction petition ***. However, the mandatory 25-year firearm enhancement was not a mandatory life sentence, and even with the discretionary sentence for murder added to the enhancement, defendant's total sentence was 40 years, less than what we have defined as a *de facto* life sentence for juveniles under *Buffer*." *Hilliard*, 2023 IL 128186, ¶ 27.

¶ 61    The defendant in *Hilliard* argued that application of the proportionate penalties clause had never been limited to only the harshest penalties. *Id.* ¶ 29. In *Hilliard*, the State conceded that, "insofar as the appellate court decision can be read as holding that an adult defendant cannot bring an as-applied challenge under the proportionate penalties clause to a sentence other

than life, it does not accurately reflect the law." *Hilliard*, 2023 IL 128186, ¶ 29. Our supreme court found that this concession was "clearly correct, as a defendant may challenge a sentence of any length." *Hilliard*, 2023 IL 128186, ¶ 29.

¶ 62    Our supreme court considered, but ultimately rejected on its merits, the defendant's claim that his sentence violated the proportionate penalties clause. The court wrote:

"When defendant's allegations are considered in conjunction with the circumstances of the case, that defendant chose to fire multiple shots at Killingsworth at close range with no demonstrated provocation in an attempt to kill him, the imposition of the mandatory 25-year firearm enhancement, which brought his total sentence to 40 years, is not even arguably 'cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community.' Rather, defendant's claim is frivolous and patently without merit because it has no arguable basis in law, such that the circuit court did not err in summarily dismissing defendant's petition." *Hilliard*, 2023 IL 128186, ¶ 40.

¶ 63    What may be confirmed from *Hilliard* is that a defendant may challenge their sentence of less-than life imprisonment under the proportionate penalties clause of the Illinois constitution based on *Miller*; but the challenge must not be frivolous or the claim remains subject to summary dismissal. Thus, reconsidering our disposition in light of *Hilliard* pursuant to our supreme court's supervisory order, we now find that defendant is not barred from raising an as-applied constitutional challenge to his sentence in this proceeding because (1) "[t]he Illinois Constitution does not limit a proportionate penalties challenge only to juveniles or individuals with life sentences" (*Hilliard*, 2023 IL 128186, ¶ 29); (2) defendant can raise a claim based on *Miller* despite the fact his sentence does not violate the eighth amendment in that he did not receive an

actual or *de facto* life sentence without consideration of the *Miller* factors, and (3) the record is sufficiently developed to make a determination on defendant's petition. *People v. Holman*, 2017 IL 120655, ¶ 32, overruled on other grounds, *People v. Wilson*, 2023 IL 127666, ¶ 42.

¶ 64    Although the *Miller* line of cases does not apply directly to defendant's sentence (*People v. Moore*, 2023 IL 126461, ¶ 40 ("*Miller* does not directly apply to young adults")), defendant may argue that the logic and reasoning of those decisions apply to him; and that, applying the rationale of the *Miller* line of cases in this case, his sentence violates the proportionate penalties clause of the Illinois constitution.

¶ 65    Whether a penalty is disproportionate under the proportionate penalties clause as applied depends on the particular circumstances of the offense and the individual characteristics of the youthful offender and how *youth* (not age) impacts those characteristics. See *People v. Harris*, 2018 IL 121932, ¶ 45; *Thompson*, 2015 IL 118151, ¶ 44.

¶ 66    After reviewing defendant's argument that his sentence violates the proportionate penalties clause and "the cold record" on appeal[1], we find that the record and defendant's pleadings are sufficient to justify further proceedings on defendant's postconviction petition and, therefore, summary dismissal was not warranted. On the merits of defendant's claim, the question for this court is whether defendant "has presented an arguable claim that his sentence[] *** violate[s] the proportionate penalties clause of the constitution." *People v. Toy*, 2013 IL App (1st) 120580, ¶ 21. Defendant relies on "the 'evolving science' on juvenile maturity and brain

---

[1]    "Whether such evidence exists depends upon the state of the record in each case. A court revisiting a discretionary sentence of life without parole must look at the cold record to determine if the trial court considered such evidence at the defendant's original sentencing hearing." *Holman*, 2017 IL 120655, ¶ 47.

development that formed the basis of the *Miller* decision" (*People v. Thompson*, 2015 IL 118151, ¶ 38) to argue that "[a]pplication of the reasoning from *Miller* *** to [defendant's] case shows that automatically treating [defendant] as a fully mature adult by applying the 20-year firearm enhancement overlooks the influences that his youth and environment had on his crime, and his ability to rehabilitate himself following a single and isolated impulsive act."

¶ 67 We note the State's argument that despite the mandatory firearm enhancement, "the relevant sentencing scheme [did not] preclude the trial court from exercising its discretion in considering [defendant's] diminished culpability and rehabilitative potential where the sentencing range was from 26 years to 80 years." Regardless, we find, after reviewing defendant's PSI and arguments in mitigation, that defendant has stated an arguable claim.

¶ 68 Defendant was 17-years old when he committed this offense. Defendant's PSI reported that defendant was then a former member of a gang; his parents separated when he was two or three years old; and defendant's father had little involvement in his life. When defendant was arrested, he was a student at Hyde Park Academy; and after defendant was arrested for this offense, he enrolled in Consuela B. York High School and received his high school diploma. Defendant's girlfriend was pregnant when he was arrested and he now has a daughter with whom he stated he has a great relationship. Defendant reported that the neighborhood he grew up in was infested with gang violence and criminal activity. He has a home to return to in a new environment. Defendant left his former gang and he has no current affiliations with any of its members. Defendant's trial attorney argued in mitigation that defendant apologized to his victim. Defendant's attorney argued defendant was acting in defendant's best judgment to protect his girlfriend but his judgment was flawed.

¶ 69     Defendant read a prepared statement that said the person depicted at trial "is not the person who you are looking to today." Defendant stated his experience helped him turn into a man. He stated he wanted to have a good relationship with is daughter and that he hoped the victim could heal. Defendant stated at sentencing that he has been helped by his experience to now make better decisions. He argued on appeal that he has demonstrated "a tremendous ability to rehabilitate himself" from what was "an isolated and impulsive act." Yet, he argued, the trial court could not fully consider "the influences that his youth and environment had on his crime, and his ability to rehabilitate himself."

¶ 70     Once again, an arguable claim is one that is based on a legal theory that has merit and facts that are not fanciful, delusional, or contradicted by the record. *People v. Brown*, 236 Ill. 2d 175, 185 (2010). In this case, the facts supporting defendant's petition are not fanciful, delusional, or contradicted by the record. They are facts in the record. For the reasons discussed above, defendant's claim has legal merit in that the evolving science of brain maturity applies to defendants who receive less than actual or *de facto* life sentences. Without limiting defendant's arguments or expressing any opinion as to whether defendant's sentence is "cruel" under the proportionate penalties clause, we find that the " 'evolving science' on juvenile maturity and brain development that formed the basis of the *Miller* decision" (*Thompson*, 2015 IL 118151, ¶ 38) can at least inform the trial court's decision based on the facts in the record as to defendant's rehabilitative potential. See *Miller v. Alabama*, 567 U.S. 460, 476 (2012) (finding "signature qualities" of youth are all "transient"). Even if the trial court in this case considered defendant's rehabilitative potential it did not do so in the light of the evolving science on brain maturation.

¶ 71     We find defendant has stated an arguable claim his sentence violates the proportionate penalties clause of the Illinois constitution, at minimum because the trial court failed to fully

consider defendant's youth and its attendant circumstances to adequately give effect to the trial court's mandate to fashion a sentence "with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. See also *Clemons*, 2012 IL 107821, ¶ 40.

¶ 72   We need not address defendant's claim that counsel was ineffective in failing to present a witness. "Under the Act, summary partial dismissals are not permitted at the first stage of a postconviction proceeding. [Citation.]" *People v. Hodges*, 234 Ill. 2d 1, 22 n8. Therefore, having found defendant stated an arguable claim based on the proportionate penalties clause, his entire petition must be advanced to the second stage. *Romero*, 2015 IL App (1st) 140205, ¶ 27. Accordingly, the trial court's judgment is reversed and the cause remanded for further proceedings on his claims.

¶ 73                              CONCLUSION

¶ 74   For the foregoing reasons, the judgment of the circuit court of Cook County is reversed and remanded for further proceedings not inconsistent with this order.

¶ 75   Reversed and remanded.